Your argument next this morning in Case 11-796, Bowman v. Monsanto Co. Mr. Walters? Mr. Chief Justice, and may it please the Court, patent exhaustion provides that once a patented article is sold, it passes outside the protection of the Patent Act and is available to be used by the purchaser to practice the invention. Now, what's the invention here? The invention is a bit of DNA that, when inserted into a soybean seed, makes that seed and all the plants that grow from that seed resistant to the active ingredient in Roundup. Now, the only way to practice that invention is to plant the seed and to grow more seeds. Why in the world would anybody spend any money to try to improve a seed if as soon as they sold the first one, anybody could grow more and have as many of those seeds as they want? I agree. No one would do that, and I don't think that's the situation here. I think we have, and we've explained, how Respondents here can protect their invention through contracts. They don't have to sell it outright. They can sell it through an agency model. But the more, I think, important— That's true in the case of any patented article, right? Correct. So the patent system is based, I think, on a recognition that contractual protection is inadequate to encourage invention. Well, part of the patent policy as well is to protect the purchaser, and that's been part of this court's law for more than 150 years. Under Respondents' theory, any farmer who grows a soybean seed is infringing the patent but for the grace of Monsanto. And that's a lot of farmers in this country when we have over 90 percent of the acreage that's Roundup Ready. So under Monsanto's theory, there's really no limit by the exhaustion doctrine. I didn't understand that last statement. Any farmer who plants and grows soybeans is violating the patent? Is infringing under license by Monsanto. Let's just take that first. I thought that their claim is that he only violates the patent if he tries to grow additional seeds from his first crop, right? Isn't that the only claim here? The reach of Monsanto's theory is that once that seed is sold, even though title has passed to the farmer and the farmer assumes all risks associated with farming, that they can still control the ownership of that seed, control how that seed is used. No, not that seed. It's a different seed. That seed is done. It's been planted in the ground and has grown other seed. It's the other seed we're talking about. It's not the very seed that was sold. That's correct, Your Honor. But if we don't apply, if exhaustion is eliminated, rather, for the progeny seed, then you're taking away the ability of people to exchange these goods freely in commerce. You have essentially a servitude on these things that are exchanged and every grain elevator who makes a sale is infringing. Well, I think you may be right in the way you characterize Monsanto's argument, and I have great difficulties with characterizing it that way, as Justice Scalia's question indicates. But Monsanto can still prevail if you say that there is a patent infringement if he plants it for seed and uses the seed to replant. That's not as far as Monsanto goes, but it seems to me it's one way to characterize their argument and to make it sensible. If you assume that there is exhaustion in the seeds that are sold to the farmer, and let's take our particular case here. Mr. Bowman went to a grain elevator, and he bought from the grain elevator, without restriction, seeds, and it was his purpose to plant them. Now, the only way that he can make use, if you assume in the first instance that there is exhaustion to the seeds that Mr. Bowman purchased from the grain elevator, you're taking away any ability for him to use that seed or use the invention. Let's take, for example, Claim 130, which is at the Supplemental Appendix 19. That's a method for selectively controlling weeds in a field. It has two elements. The first element is planting the crop seed, and it's a particular crop seed with all of the particular genetics that encode for a resistance to roundup. And then the next step is to apply to the crop and weeds in the field a sufficient amount of glyphosate herbicide. Now, if you say that there's exhaustion in the seeds that Mr. Bowman purchased from the grain elevator, but you say it doesn't apply to the progeny, you're not allowing him to actually practice the invention to grow more seeds. No, but you are allowing him to use those seeds for anything else he wants to do. It has nothing to do with those seeds. There are three generations of seeds. Maybe three generations of seeds is enough. But it is for this example. First, you have the Monsanto, the first generation they sold. They have children, which is the second generation. And those children have children, which is the third generation. Okay? So, bad joke. So, we're talking here, he can do what he wants with the first generation. Anything he wants. And moreover, when he buys them from Monsanto, he can make new seeds. He can make generation two because they've licensed him to do it. Here, he buys generation two. Now, he can do what he wants with those seeds. But I'll tell you, there is a problem. Because the coming about of the third generation is itself the infringement. So, the second generation seeds have nothing to do with it. If he went into a room and had a box that he bought from Aladdin, and he put rocks in it, and he said, hocus pocus, and lo and behold, out came the third generation of seeds. He would have infringed Monsanto's patent with that third generation. Would he not? No. No, he wouldn't have. You mean if he goes and finds a new way of making these seeds, which happens to do with you pick some grass and you intertwine it and various things like that, and lo and behold, you have a perfect copy of Monsanto's patented seed. He hasn't made it. He hasn't infringed. Why not? Well, I guess I misunderstood your question. My question is the same with the grass as with the magic box. I'm saying the problem for you here, I think, is that the infringement lies in the fact that he made generation three. It has nothing to do with generation two. That has just a coincidence. That is, in fact, the way he made these seeds. But he can sell, resell generation two. He can do whatever he wants with it. If he sterilizes it and uses them in a circus, he can do it. The only thing he cannot do is he cannot create generation three, just as he couldn't use generation two seeds to rob a bank. You know, there are certain things that the law prohibits. What it prohibits here is making a copy of the patented invention, and that is what he did. So it's generation three that concerns us, and that's the end of it. Now, what is your response to that? Justice Breyer, my response is if you apply the law that way to side making over use, you are eliminating the exhaustion doctrine in the context of patented seeds. You're saying that he can do anything but crack a lot of inventions. He says making or use, and it isn't an either-or thing. Then, as the other side has pointed out, you can use the seed to make new seeds. So use and make, it's not either you use it or you make it. You can use it to make a new item. Justice Ginsburg, that is the point of the invention here. If you look at Claim 130 again, for example, you are saying he can't practice Claim 130, which is certainly embodied in the seeds he purchased from the grain elevator. Suppose he had never bought any Monsanto seeds. He just goes to the grain elevator, and 90-odd percent of those seeds have the genetic composition. And he planted that, and he harvested it. Would he be infringing on Monsanto's patents? No. So he never has to buy any seed at all from Monsanto. Well, in practical matters, it doesn't work that way, because the seed that's available at a grain elevator is not a very good source of seed, and farmers are not going to be able to eliminate the need to go to Monsanto or the other seed companies every year by going to the grain elevator. Great evidence of that is the fact that my client, every year that he planted a second crop using the grain elevator seed, he bought high-quality seed from Pioneer. Now, if this grain elevator seed was so good, why didn't he use it for his first crop? I'm still not getting the answer. I'm going to try once more. Now, when you buy Generation 2, well, there are a lot of things you can do with it. You can feed it to animals. You can feed it to your family and make tofu turkeys. I mean, you know, there are a lot of things you can do with it. All right, but I'll give you two that you can't do. One, you can't pick up those seeds that you've just bought and throw them in a child's face. You can't do that, because there's a law that says you can't do it. Now, there's another law that says you cannot make copies of a patented invention, and that law you have violated when you use it to make Generation 3, just as you have violated the law against assault where you use it to commit an assault. Now, I think that's what the Federal Circuit is trying to get at, and so it really has nothing to do with the exhaustion doctrine. It has to do with some other doctrine, perhaps, that somehow you think should give you the right to use something that has as a basic purpose making a copy of itself. Maybe you should, but I don't see that. Where is that in the law? Your Honor, that's an exception to the exhaustion doctrine for self-replicating inventions. Is that there in the exhaustion doctrine? It is not there. This Court has not created an exception to the exhaustion doctrine, and, in fact, it's explicitly said it won't do that, and that's an activity for Congress. I'm sorry. The exhaustion doctrine permits you to use the good that you buy. It never permits you to make another item from that item you bought. So that's what I think Justice Breyer is saying, which is you can use the seed, you can plant it, but what you can't do is use its progeny unless you're licensed to because its progeny is a new item. This is obviously a brand-new case where we're dealing with the doctrine of patent exhaustion in the context of self-replicating technologies. So what you have here is if you take the Federal Circuit's view, then you have no exhaustion at all for someone to practice the invention. Sure, you can do all the things that you talked about, Justice Breyer, but that has nothing to do with the invention. So you're taking away the exhaustion doctrine for self-replicating inventions. You're modifying this Court's case law substantially, and that's something that ought to be done in Congress. Well, you just said that we haven't had a case involving self-replicating. I mean, the exhaustion doctrine was shaped with the idea of an article. There was an article that you could use, and then you use it, and it's used up. But we haven't applied the exhaustion doctrine when you have a new, when you create a copy of the original. So it's not that we have law in place. We've been dealing with an item with the exhaustion doctrine, and now we have hundreds of items, thousands of items, all going from that original scene. The exhaustion doctrine, the policy that underlies this Court's cases, is fundamentally a choice about the purchaser's rights in that personal property over the patentee's rights in the monopoly to use that monopoly and increase its sales. This Court has always chosen the purchaser's rights over the patentee's rights to increase sales, and we're just asking you to make the same choice here. Except to the extent, as Justice Breyer suggested, except to the extent that the purchaser is going to use the article just to create a new one of the exact same kind. And it seems to me that what you're suggesting is that the basic rule that says that the purchaser does not get to do that should have an exception for self-replicating technologies. First, we disagree that the activity of basic farming could be considered making the invention. If you read the statute, it says making the invention, not just making a copy like it would be in the Copyright Act. We have the invention, which is a particular genetic sequence that was made principally by Monsanto's genetic engineers, and farmers, when they plant seeds, they don't exercise any control or dominion over their crop, otherwise every year they'd have a bumper crop. Do you mean they don't do any work? They don't lay the soil and the nutrients it needs, water when it needs watering, protect it from animals? They do no work? They absolutely do work, but they don't have control over the creative process. They plant, they spray, and they pray. If they don't do all of the things I said, it doesn't grow. So aren't they involved in its creation? In its creation? They certainly aren't in control of it. You ask any farmer who's lived through a drought or through a terrible flood, and they will say they're not the ones who are making these seeds. Well, you only need one. I mean, you throw the seeds on the ground, one or two of them are going to grow, and you still have the same case, right? Absolutely, and that's how broad this position is. It doesn't matter how you come into possession with these seeds. You are committing patent infringement if you... That's true, but that's what I thought you were going to respond. I thought you were going to respond to me, that my question then makes it infringement when your client buys Generation 1 from Monsanto because they buy Generation 1 from Monsanto, they plant it in the ground, and lo and behold, up comes Generation 2. And Generation 2, on the basis of what I was asking you, is just as much a violation. But I think that I'll find out from them that the response to that is, yes, you're right. It is just as much a violation. That's why we, Monsanto, give the buyer a license to do it. And so it all seems to work out. You don't need any exception. There's no exception from anything. When you create a new generation, you have made a patented item, which you cannot do without the approval of the patent owner. Therefore, Monsanto gives that approval when you buy Generation 1. Now, it seems to me all to work out without any need for exception. And I'm putting to you my whole thought so that you can respond to it. Thank you, Justice Breyer. What Monsanto wants to do in your scenario is they want the farmer to assume all the risks of farming, but they still want to control and act as owners of the property that is owned, no doubt, by that farmer. When that farmer grows the progeny seed, they ensure the risk that they're not going to have a crop in the first place. If they drive to the grain dealer to sell their harvest, they get one paycheck a year, by the way, if they get into a wreck, that's not Monsanto's problem. That's the farmer's problem. So what they're essentially asking for is for the farmers to bear all the risks of farming, yet they can sit back and control how that property is used. And that's fundamentally inconsistent with how this Court has interpreted the Exhaustion Doctrine. The thing that's very important is this is not a license. This is an outright sale to the farmers of the first generation. And then they plant those seeds because they have, under the Exhaustion Doctrine, a right to use the invention. And then those progeny seeds are owned outright by every farmer, and they assume all risk of loss. They may own them, but that doesn't mean that they're infringing. They may... The seeds are owned by the farmer, but when he uses them to grow more seeds, he's infringing on their patent. So I don't think that the ownership has anything to do with it. It's a servitude on the title. I mean, those things get sold to the grain elevators, and now every time the grain elevator makes a sale, it's technically infringing. And that's something that our law has never allowed for centuries. And one of the main problems is that you have farmers, their main livelihood here is to sell the seeds that they grow. Now, if they don't have clear title and if they don't have the ability to sell the property that they grow, then that impinges upon their ability to make a living. I have one question, just a farming question. With some crops, if you're going to make seeds, you leave the crop in longer. What about soybeans? If the farmer has the North 40 and the South 40, the North 40 he's going to plant soybeans to be used for flour, human consumption. South 40, he wants seeds. Does he leave the plants in the ground the same amount of time? Most farmers are not growing soybeans for seed. There are various types of farmers who are growing foundation seed, for example, that is very close to the first-generation seed that's engineered. I don't understand this. I thought soybeans are seeds. They are. But if you're going to use the soybeans for seeds as opposed to flour, do you leave them in the ground any longer? I don't know the answer to that question. Mr. Walters, could you go back to the Chief Justice's opening question? Because the Chief Justice asked you what incentive Bonsanto would have to produce this kind of product if you were right. And you said, well, they can protect themselves by contract. Actually, it seems to me that that answer is peculiarly insufficient in this kind of case. Because all that has to happen is that one seed escapes the web of these contracts. And that seed, because it can self-replicate in the way that it can, essentially makes all the contracts worthless. So, again, we're back to the Chief Justice's problem that Bonsanto would have no incentive to create a product like this one. Taking our example here where Petitioner bought commodity seeds, it's an undifferentiated mixture. It can't be overemphasized how different every single seed is. You don't know a Bonsanto from a Pioneer from an Asgrow. You don't know the maturity rate. If I'm a farmer, I need a particular maturity bean for my field because I don't want it to mature before it gets high enough for the combine to come around and cut it. So you want to be able to have, you have all these things dialed in, these different variabilities. So if you go to the grain elevator and you don't know exactly what it is that you want and you just get a mixture, that's not going to be real competitive at all to Bonsanto's first generation seed. Now the possibility of somebody selecting one and saying, ah, that's the exact one that I need for my field, I'm going to cultivate that and let it grow into enough seeds so I can plant my first crop, that would take a number of years to grow a thousand acre farm. And it's not, and by that time, farmers, the nature would have changed and evolved where you would want the latest in disease resistance by that point. So there are. Please correct me if I'm wrong. I thought that's exactly what Bowman did here. He went to the grain elevator and he used the seeds and he didn't know exactly the percentage mix, but he used them. So he did exactly what you said is uneconomical. No, actually he did something quite different. He didn't select a particular variety. He selected for the particular trait Roundup Ready, but there are probably more than a dozen different ways in which the seed can vary disease resistance, maturity rates. And if you are a farm. I'm sorry, maybe I didn't read this right. I thought what he did was plant all the commodity seeds and then applied the Roundup so that all that was left was the Roundup resistance seeds. And then he used those. That's correct. But if you look at a field that you plant with grain elevator seed, it's going to be all different color because they're going to be all different variety. They're all going to mature at a different rate so that when it comes to harvest time, some of them are going to be too close to the ground so that your combine is going to miss. Including the Monsanto seeds? Including the Monsanto seeds. Some of them would grow at different rates than others. Absolutely. How come that's not a problem the first time you plant? It's a problem each time. This is a very poor choice of seed, but it only makes sense to plant in a risky situation like when a farmer has been washed out from a flood, for example, and it's late in the season. No, no. I mean the very first time you get nothing but Monsanto Roundup Ready seeds and you plant those. Were you telling us you have the same problem with them growing at different rates and all that? Yes. All right. So that doesn't make the commodity seeds any different. I'm sorry. I must have misunderstood your question. The Roundup Ready commodity seeds will all grow at different rates and have  That's not the original batch that he buys from Monsanto. Correct. The original batch that he buys from Monsanto in addition to being resistant to the chemical that kills the weeds, in addition to that, they all mature at the same rate. Exactly. They're of a uniform variety. They're exactly what a farmer needs for their So all the Monsanto seeds are not fungible. That's correct. There are some of them that mature early, some mature late. It makes sense. I mean, they allow these seeds to be dumped into the common grain elevator. They don't put any restrictions on what the elevator does with it. There were no restrictions on my client when he purchased them from the grain elevator. So it's less of a problem for Monsanto for people going to the grain elevator to plant. Nevertheless, it's an outright sale and exhaustion applies to that particular sale and permits that farmer to use it. It's never going to be a threat to Monsanto's business to people planting grain elevator seed. Now, to answer your question, Justice Kagan, about, well, under our theory, if somebody does breach a contract with Monsanto, they don't have to do it under contract law. They can actually do it under an agency model like General Electric did in the 1920s. And that's only fair because there, the agent growers are assuming, well, Monsanto is assuming the risk that the farmers are. And there's some equitability there with the risk sharing between the farmers and Monsanto. Now they want the farmers to take all the risks associated with farming, yet they want to control how they use those seeds all the way down the distribution chain. I'll reserve the balance of my time. Thank you, Counsel. Ms. Sherry? Mr. Chief Justice, and may I please report. I'd like to start by talking about this Court's decision in J.E.M. because I think it largely resolves this case. J.E.M. was a patent case, and the issue there was whether or not you can get a utility patent on a plant. The argument was that you couldn't get a utility patent because the Plant Variety Protection Act implicitly repealed the Patent Act in that respect. This Court rejected that argument, and the reason it rejected that argument was because it found no conflict between the two statutes. The reason it found no conflict between the two statutes is because it said that it is harder to get a utility patent, and for that reason you get greater protections under the Patent Act. You get greater rights of exclusion under the Patent Act than you do under the PVPA. And it said, most notably, there is no seed-saving exemption in the Patent Act. There is no research exemption in the Patent Act. The consequence of Petitioner's argument would be that this Court would not  be doing much, much, much more under the guise of patent exhaustion. Justice Breyer, as you pointed out, the exhaustion doctrine really has nothing to do with this case, and that's because the exhaustion doctrine has always been limited to the particular article that was sold, and we're talking about a different article here, and it's never extended to the making of a new article. Well, but I mean, the reason it's never is because this is an entirely different case. It's the reason it's here, because you have the intersection of the exhaustion doctrine and the normal protection of reinvented articles. So I don't think it gets you very far to say that we've never applied the exhaustion doctrine that way either. We've never applied the reinvention doctrine to articles that reinvent themselves, like plant seed. It's true that the Court hasn't had an exhaustion case specifically involving this sort of replicating technology, but when the Court has talked about exhaustion, it's always focused on the specific article that's sold, and it's done that for a reason. The concept underlying exhaustion is that when the patent holder controls that very first sale, it gets the one royalty with respect to the actual article sold. Petitioner's argument isn't limited to the commodity green that we're talking about. It's not even limited when you talk, Justice Breyer, you mentioned the three different generations of seed. There's actually quite a few more generations than those three. If the concept is the sale of a parent plant exhausts the patent holder's authority, not only with respect to that seed, but with respect to all the progeny seed, we would have to go all the way back to the very first Roundup Ready plant that was created as part of the transformation event. Every single Roundup Ready seed in existence today is the progeny of that one parent plant, and as Your Honor pointed out, that would eviscerate patent protections. There would be no incentive to invest, not just in Roundup Ready soybeans or not even agricultural technology, but it's quite a bit broader than that. In order to encourage investment, the Patent Act provides 20 years of exclusivity. This would be reducing the 20-year term to essentially one and only sale. It would be near impossible to recoup your investments with that first sale, and so the more likely consequence is that research dollars would be put elsewhere. That's a pretty horrible result, but let me give you another horrible result, and that is if we agree with Hugh, farmers will not be able to do a second planting by simply getting the undifferentiated seeds from a grain elevator, because at least a few of those seeds will always be patented seeds, and no farmer could ever plant anything from a grain elevator, which means I gather they use it for second plantings where the risks are so high that it doesn't pay to buy expensive seed. Now, they can't do that anymore, because there's practically no grain elevator that doesn't have at least one patented seed in it. And the answer to that is this is actually not a traditional farming practice. Despite what Petitioner said, farmers do not generally go to grain elevators, buy commingled grain, plant it in the ground as seed. If you look at the American Soybean Association brief submitted on behalf of soybean farmers, it says as much. If you look at the CHS brief, which is submitted on behalf of grain elevators, it also explains that, and there's a number of reasons why that is the case. There's the reasons that Petitioner talked about, which is that they are an undifferentiated mix, but there's other reasons as well. The business of grain elevators is not to sell commingled grain as seed. If that was their business, they would have to comply with seed labeling laws. They do not do so because it's not their business model. That's why it's so cheap. That's why farmers want to use it for cheap planting. But farmers wouldn't be able to use it for another reason as well. Even if you take patent law and you put it entirely to the side, there's still the plant variety protectionist. But correct me if I'm wrong. I thought that's what Bowman did. Bowman absolutely did it in the circumstance, but Bowman also said that he's not aware of other farmers who are engaging in this practice. And, again, there's another reason. Putting aside the labeling laws, there's the Plant Variety Protection Act. And as Pioneer points out in their amicus brief, it is quite likely that a large amount of the commingled grain is not only protected by patent, but is actually protected by a plant variety protection certificate. And what Petitioner did here would infringe the plant variety protection certificate. So even putting patent law to the side, this is not an economically viable source of seed for farmers regardless. And Petitioner's argument, again, isn't limited to the grain elevators. It would apply to saving your own seed and planting it generation after generation. It would apply to selling seed to your neighboring farmer. And it would allow seed companies to essentially compete with Monsanto upon the first sale. So when are the patent rights exhausted in the seed? The patent rights are exhausted in the seed at the same time they're exhausted with respect to any other product upon an authorized sale. And so, Justice Breyer, again, you had it right when you were saying that you can do what you want. In our view, once there's an authorized sale, you can do what you want with respect to the seed that you've actually purchased. That is the tangible article that you paid for. But you do need permission from the patent holder in order to make a new generation of seed. To the extent, you know, any middle ground is warranted with all due respect, we would point to Congress as the appropriate body. I'm sorry, just so I can follow your answer. Monsanto sells the seed to the farmer. And if the farmer grows the seed, he can sell it to anybody he wants, right? If Monsanto authorizes... I'm putting aside all the contracts and stuff. Right, so if Monsanto authorized that first sale and authorized the planting, they would also have to authorize the sale of the second generation seed because it's a new article. And that's exactly what happened here. If you look at the technology agreement, and it's not just because it's a contract, because I think it's significant to the analysis, Monsanto, upon the first sale of the bag of Roundup Ready seed, authorizes the planting for one commercial crop, and it authorizes the farmer to sell that as a commercial crop or to use it for any purpose other than replanting. That is an authorized sale. And so if you take that second generation seed, second generation is a bit of a misnomer, but if you take that seed and you follow it through, all of the patent rights with respect to that particular seed have been exhausted, but you cannot take that seed without separate authorization,  Well, it sounds like the patent rights haven't been exhausted then. They've been exhausted with respect to the particular article full. When the courts talked about patent exhaustion, you're not exhausting the rights with respect to the patented invention. You're exhausting... You mean it's been exhausted with respect to the one bean? Yes, and that's always the case. Just as if I sell, I mean, even if they can authorize... Well, it's always the case because it's a very... The other cases haven't involved this situation where you're talking about self-regenerating product. But I think there is other technology out there. I mean, even if you think of software, for example, there are plenty of other products where one reasonable use is to make more. I could purchase software. One reasonable use would be to make a dozen other copies to give to my friends or to sell on eBay. It's a reasonable use, but it's an infringing one. Well, we haven't had that case either. The court hasn't had that case exactly, but it did decide Microsoft versus AT&T, and granted that was on a slightly different issue, but in that case, the court recognized that case. It was copies from a master disk, and it treated them as separate copies because they were actually separate articles, even though it was really easy to do, even though the actual copying is not done by human hands. It's done by mechanical processes. And in fact, in that case, the court talked and compared the making of software to the reproduction through biological processes, which is what we're talking about here. And so all we're asking the court to do today, I recognize it's a new technology, and to the extent new technologies require different rules, Congress is the body that should be making those different rules. And when Congress has acted in this area, in the Plant Variety Protection Act, and also in the software context in the Copyright Act, it has not adopted the wholesale exemption that Petitioner is asking for here. I'm sorry. In everything you said, you agree with Mr. Waxman. There's this issue in the case where you disagree, which is the conditional sale doctrine. I'm just wondering, before you finish up, could you say a bit about whether that doctrine is causing trouble as it presently exists in the Federal Circuit? In other words, could we just ignore that doctrine if we wanted to, or is it a very problematic one that we should take this opportunity to do something about? Yeah. I think the court does not need to do something about it in this case. I think Kwanzaa largely decided the issue, even though it didn't say so explicitly. And as far as I'm aware, the Federal Circuit has not applied their previous version of the conditional sale doctrine to enforce the post-sale restrictions since this Court's decision in Kwanzaa. Thank you, Counsel. Mr. Waxman? Mr. Chief Justice, and may it please the Court, let me start by answering a couple of, I guess, science or technology questions that came up before launching into our doctrinal position. First of all, Justice Kennedy, soybeans are soybeans. They are harvested at a particular point in time, whatever use is going to be made for them. It is not a plant like a flower, geranium, for example, which has to be left to go to seed or alfalfa. The bean is the seed. All soybeans have to be processed to be used in any way. If they're going to be planted, they have to be cleaned before they are put in the ground at the right time. If they're being fed to either humans or animals, they have to be processed in a way that eliminates an enzyme that makes them indigestible by animals. Justice Scalia, your question about, well, farmers now just can't do second plantings because soybeans are put in huge grain elevators and different varieties are mingled, that is true in the sense that if one or more of those soybeans were protected by a patent, the actual growing of the use of those patented inventions without a license would be infringement, although, of course, if no glyphosate were put on top of it, neither the farmer nor Monsanto would ever know that there was an act of infringement. But more to the point, farmers, I mean, the planting of second crops, that is, crop rotation of interspersing soybeans and winter wheat is very, very common. There are hundreds of thousands of soybean farmers who do this every year. Mr. Bowman has acknowledged that, so far as he knows, he's the only one who's doing it this way. But there are plenty of other ways in which he could obtain a much less expensive crop of, you know, a particular variety of soybeans, so it will all grow to the same height and germinate at the same time. And, in fact, he explained this to the district court in his response to the motion for summary judgment at page 152A of the joint appendix. He said, defendant wanted a cheap source of seed for his second crop beans because of the normal risks in growing, quote, wheat beans, that is, the second crop that follows the harvesting of winter wheat. Quote, defendant simply wasn't going to plant the high-priced soybean seed after his wheat crop. And here's the relevant sentence. Defendant could have purchased conventional seed, that is, non-patented seed, and then saved its offspring for wheat beans. In other words, he could have gone and bought a non-patented, a bag of non-patented seed for much less money and used it as his second crop or harvested a portion of it and soybeans replicate at a rate between 20 and 80 times in each generation and have a perpetual source for his second crop thereafter. But he couldn't put the herbicide on. He couldn't. If he went and bought conventional seeds, not the genetically improved seeds. Exactly. Then he wouldn't. What would the yield be if he put the herbicide on it and they were killed? Justice Ginsburg, the glyphosate resistance doesn't change the yield of a particular plant. It changes the way you have to control weeds. And he would not be able to use Monsanto's technology that would allow aerial application of an herbicide. He would have to, if he wanted to buy plain, old, you know, conventional soybeans, he has to control for weeds in the conventional way. And here's the very next sentence of his response to the Court. Defendant, that is, instead of purchasing conventional seeds and saving them, he says, defendant decided to purchase a grain dealer's commodity grain because he felt there was a good chance he would obtain mostly grain that would be resistant to glyphosate. And therefore, he could use Monsanto's technology without having to pay for it. Mr. Chief Justice, your question about this is a new case. I mean, let me go first to your first question in the case, which is why would a company ever want to do this? I think the answer is that without the ability, let's talk about soybeans and then broaden it to other kinds of readily replicable technologies, without the ability to limit reproduction of soybeans containing this patented trait, Monsanto could not have commercialized its invention and never would have produced what is, by now, the most popular agricultural technology in America because, as Ms. Sherry was pointing out, the sale of the very first Roundup-ready soybean seed, from which all the trillions of Roundup-ready soybean seeds in existence now derive, would have, under Mr. Bowman's theory, fully exhausted not only Monsanto's rights in that seed that was sold, but in all progeny unto the however many generations Justice Breyer thinks is not too many. I think it's important to understand how this technology works. The Department of Agriculture licensed Monsanto to engage in a transformation event. That is to introduce its recombinant gene into soybean germplasm. It's illegal to do it unless you get a government license to do it. And you can do it once, and that is done by the technology company taking something that's called a gene gun and using the gene gun to inject recombinant DNA into regular germplasm. What do you mean you can do it once? The Department of Agriculture authorized Monsanto to transform natural plant material with its recombinant gene in one single event that's referred to as a transformation event. One shot of the gun. I think you may be able to shoot several. I don't know whether you can shoot a whole round or whatever, but in any event, it's one event. You can't rob a bank with it, though, right? I, in my mind, have been trying to figure out what a gene gun looks like, and I don't know if you could use it to rob a bank, but the point is, and the Federal Register site for the transformation event with respect to Roundup Ready is provided in a footnote in our brief. What happens then is that Monsanto uses those transformed cells to grow a soybean plant, and that soybean plant produces seeds or soybeans that have the recombinant Roundup Ready technology in it. Monsanto then provides, in almost all of the cases, Monsanto engages in licensed sales of those transformed seeds to hundreds of different seed companies that produce different varieties, and they make both conventional seed with a particular varietal makeup and a Roundup Ready version of that variety. Monsanto provides the soybeans that it has transformed to the seed companies, to the hundreds of seed companies for consideration. Under Mr. Bowman's theory, that was it for all of Monsanto's rights with respect to this technology. The very first time it took an original transformed seed and sold it to a seed company so that it could bulk up and crossbreed and produce different varieties, Monsanto had lost all of its patent rights. In other words, by having committed hundreds of millions of dollars in 13 years to develop this technology, in the very first sale of an article that practices the patent, it would have exhausted its rights in perpetuity. Mr. Rutland, there's a worrisome thing on the other side, though, too, and that is that your position has the capacity to make infringers out of everybody. And that's highlighted, actually, in this case, by how successful this product is and how large a percentage of the market it has had. So that, you know, seeds can be blown onto a farmer's farm by wind and all of a sudden you have Roundup seeds there and the farmer is infringing or there's a 10-year-old who wants to do a science project of creating a soybean plant and he goes to the supermarket, he gets some edamame, and it turns out that it's Roundup seeds. And, you know, these Roundup seeds are everywhere, it seems to me. They're, what, 90% of all the seeds that are around? So it seems as though, like, pretty much everybody is an infringer at this point, aren't they? Certainly not. Let me make three points, starting with the edamame and moving up to inadvertent infringers. Edamame is an immature form of the soybean seed. You can plant edamame... Okay, I'll change the hypothetical. If you take... If I take, you know, my Girl Scout troop and have them do a science experiment, it will rot, but it will not generate. And that, I think... I thought I was being so clever, too. Well, it also reminds me that my original answer to Justice Kennedy is wrong, which is that edamame is taken from the pods before the thing becomes actually a seed that can be processed in any other way. Your point about the ubiquity of Roundup Ready's use is a fair one. I mean, this is probably the most rapidly adopted technological advance in history. The very first Roundup Ready soybean seed was only made in 1996, and it now is grown by more than 90% of the 275,000 soybean farms in the United States. But size, that is, success, has never been thought and can't be thought to affect the contour of patent rights. You may very... I mean, soybean, the problem of blowing seed is not an issue for soybeans. Soybeans don't... I mean, it would take Hurricane Sandy to blow a soybean into some other farmer's field, and soybeans, in any event, have perfect flowers. That is, they contain both the pollen and the stamen, which is the reason that they breed true, unlike, for example, corn. The point that there may be many farmers with respect to other crops, like alfalfa, that may have some inadvertent Roundup Ready alfalfa in their field, may be true, although it is not well documented. There would be inadvertent infringement if the farmer was cultivating a patented crop. But there would be no enforcement of that. The farmer wouldn't know. Monsanto wouldn't know. And in any event, the damages would be zero, because you would ask what the reasonable royalty would be, and if the farmer doesn't want Roundup Ready technology and isn't using Roundup Ready technology to save costs and increase productivity, the royalty value would be zero. Oh, it's... I mean, that is an interesting question, because you can imagine... You see, your answer... This really deals with all. It could be with genetic patents, with hosts of things which are self-replicating, and some of the self-replicating items, which are infringing items, end up inadvertently all over the place. Is there anything in the patent law that deals with that? Is an involuntary infringer treated the same under patent law as a voluntary infringer? Is there precautions that you take? I mean, is there anything in patent law that helps? So infringement is... Unlike contributory infringement or induced infringement, the act of infringement, that is a violation of Section 271, is a strict liability tort, but it requires affirmative volitional contact, conduct. That is, it's not that a thing doesn't infringe, a person infringes. Plants it. I mean, he plants it, but he doesn't even know. We can't imagine a lot of circumstances where this would be Justice Kagan's question. You're just saying that would need a modification in patent law. Of course. I mean, take the example, and this goes to, I think, a comment made by the Chief Justice, that even in the software context, we haven't had this case yet. You did have this case in Microsoft v. AT&T that involved Microsoft's golden disk that has the Windows operating system on it, which is patented, and was being exported overseas for introduction into computers that were manufactured overseas, and AT&T's patent, which was a method of compressing speech, was practiced by the Windows software, and this court held that although the writing of the Windows operating system into computers in the United States would have infringed the patent, and when Microsoft did that, it did infringe AT&T's patent, the fact that the copies were made onto the hard drives of the computer overseas meant that the act of infringement occurred overseas, and there was not an export of an infringing product for the purposes of infringing overseas for purposes of Section 271F. So I think you have decided in the context of software, which of course replicates even more readily than soybeans do or vaccines or cell lines or plasmids, that the copies that are actually made when a software is written onto the hard drive of a computer is a different thing than the disk that was sent and is infringing if it occurs within the United States. What about the other question? I want to go back to a different question that was asked, which was the question of what do you think we should do about this other aspect of the case, the licensing aspect. I mean, I would have thought it doesn't concern Monsanto's license of Generation 1, because insofar as it's relevant here, Generation 1 carries a license that is just permissive. It is to create Generation 2. But they also said something in the circuit about a restriction implied perhaps on the use of Generation 2 by the grain elevator for creating Generation 3, namely, you can't do that. Now, they thought, the circuit, that there's some restriction in a license, and they have a doctrine that seems to say that you can restrict licenses, through licenses, the use of a product after it's been sold. And that would seem contrary to the first sale doctrine. Okay. Let me answer your question this way. First of all, we don't think that there's any need whatsoever for this Court, we agree with the government, that there's no need for the Court to address the question of conditional sales and the extent to which patent law recognizes, under some circumstances, conditional sales, because in this case, the Federal Circuit did not address that ground, which we advocated, and we still advocate, but instead said, and I'm reading from 14A of the Petition Appendix, Even if Monsanto's patent rights in the commodity seeds are exhausted, such a conclusion would be of no consequence, because once a grower, like Bowman, plants the commodity seeds containing Monsanto's Roundup Ready technology, and the next generation of seed develops, the grower has created a newly infringing article. In other words, what the Federal Circuit decided, and it is entirely correct, and it should be affirmed on that basis, is what you're calling, I think, Generation 3. Let's say that, for simplicity's sake, since Generation 1 is the original soybean sold by Monsanto to seed companies, let's just say that the bags of soybean seeds that farmers go to purchase from seed dealers is called Generation N, and they are licensed to produce Generation N plus 1. But then, what about N plus 2? So, what the Federal Circuit held is N plus 2 has never been sold. It was created, it exists without a sale, and because a sale is the sine qua non of patent exhaustion, which is also referred to as first sale, there is no exhaustion. Alternatively, the Federal Circuit said, in any event, even when exhaustion applies, it only privileges the using or selling of the article sold. As Your Honor's questions pointed out originally, it never privileges the making of a new infringing product. Could you prevail in this case if we focus just on use rather than make? If you're referring to Generation N plus 2, the answer is yes, because those are newly infringing products with no exhaustion of Monsanto's rights, and as a consequence, farmers have no authority to use, make, sell, or offer to sell without Monsanto's authorization. That is just the straightforward application of Section 21. Mr. Waxman, I want to go back to Justice Breyer's question and reformulate it as a different question with, I think, the same answer, but I just want to make sure you and the government are exactly on the same page. Both of you are suggesting, I think, that was Ms. Sherry's last response, that we were explicit enough in quanta and we don't have to address whatever lingering confusion the Federal Circuit may have with respect to conditional sales at all in this case? You're telling us we don't need to reach that prong and we shouldn't? I agree that you don't need to reach the prong and we shouldn't. I understand we don't need to, but the question is should we? Is there a need generally in clarifying some lingering confusion? I think that an appropriate case will come up where it will be important for you to determine that. And our third argument, which wasn't addressed by the Federal Circuit and isn't necessary to affirm, is that conditional sales are not ipso facto unenforceable. That is, everybody understands that if instead of selling technology you lease it and you sign a license that imposes conditions on that lease, unless they are unreasonable, conditions that are reasonably related to exploitation of the invention are enforceable. Mr. Bowman acknowledges that. Everyone acknowledges that. Our single submission here is that where you have a technology that cannot be leased because it will consume itself in whatever use one makes of it and therefore an article embodying the invention has to be sold and where the invention cannot be commercialized if the inventor has to realize its full cost of development and a reasonable rate of return on the first sale, the fact that there is this necessary sale in order to commercialize the invention cannot ipso facto make all such conditions unenforceable. And that's all — if you were to reach the conditional sale issue in this case, that is all we think this case stands for. And the reason I think — Actually, then you do have a different position. Yes. And I think the reason — if we take it out of the soybean area, let's look at vaccines. Because the Roundup Ready gene essentially immunizes soybean plants from the herbicide in the same way that a life-saving vaccine will immunize individuals that receive it from some external — it wouldn't be herbicide — a life threat. Okay, vaccines are live. They're live cultures. They can regenerate themselves. If a company develops the vaccine for H1 — I shouldn't be — an important life-saving vaccine, it's unsupportable to say that you cannot sell a quantity of that vaccine without exhausting all of your rights in it. I mean, when Plowing Shear or Bristol-Myers develops a vaccine and sells some of it to CVS so I can go in and get injected, they haven't lost all of their patent rights in that vaccine. CVS can't turn around and become a competitor. Simplifying this case, you can't take the person who's been given the vaccine and take vials of their blood and keep selling it? Is that your position? Yes, and keep replicating it in competition. Take another example. Well, is that how it works? No, I mean, I'm curious. Your example, it seems to me, is not quite on point because it's not a situation where the intended use of the vaccine necessarily results in regeneration of it. In your hypothetical, CVS was going to some lab and making more, right? Well, CVS was presumably buying it either from the manufacturer or another lab. But the point here is that, to take the software example, if I go to Staples and buy the Windows operating system on a disk, I don't have the authority to put it in a disk replicator or press a button and make a million copies of it. But you don't need that because, as you say, you're making new ones. It's the making of the new ones, not the use of the old ones. That's where you prevent that from being done. Yeah, well, let me say, I mean, the example that comes to mind is, of course, poor Dr. Chakrabarty, who invented a new man-made bacteria. Bacteria replicate themselves, unlike soybeans, which require human intervention. I mean, the notion that... Then you use the word use. Excuse me? Then you use the word use and you get to the same place. I don't think you can think of an example. I mean, you say, I don't think you can think of an example where, if you win on the other ground, you can produce a bad result for the manufacturer or the inventor because you haven't treated the conditional sale like a license. I'm not saying you can't. I just can't think of one. Okay, here's one. I'll use something that doesn't make itself because we think that's covered by the new article. Let's say that I invent a miraculous new machine. I get a patent for it. I want people to be able... I'm going to commercialize it or I'm going to license with people to commercialize it, but I want people to be able to study it and research it. And so, like Monsanto with its seeds, I sign, I provide a copy of the machine to MIT with a research-only license. That is, you can use this machine to figure out how it works and develop new applications and all that sort of stuff. If that sale is exhausting for all purposes, I can't prevent MIT or a third party that MIT provides the machine for... To lease it. ...to go into competition with it. To lease it. Yes, but you can't lease articles like software and, you know, soybeans that consume themselves in any use other than an art experiment. I do have this problem. It goes back to Justice Scalia's example. What about the commodity bin that has 2% of the patented seeds in them? Now, you get away from the article by saying, oh, well, almost all seeds are rounded up these days. But let's have some different commodity where there are three or four different patented items, but 1%, 2% of the seeds are in the bin. You can't sell those. That seems to me a very extreme resolve. Well, I mean, when you say you can't sell them, so as Ms. Sherry was pointing out... You can't sell them if they know they're going to be used for seeds and you can't use them for seeds even though there's only 1% of the seeds. That would be true even if this case came out another way, Justice Kennedy. First of all, because grain elevators are prohibited by state and federal law from selling seed, period. They buy grain and they sell grain. They can't sell seed. Number two, almost all varieties of soybeans or other crop plants are currently protected under the patent in the Plant Variety Protection Act, as this Court in Congress recognized. The requisites for getting a certificate are... I mean, it's like a registration requirement. And we know from JEM and the relevant provision of the PVPA that it is unlawful to divert crops that are protected by a PVPA certificate for reproductive uses. So, irrespective of all of this, whatever happens, even if there's only 1% of patented soybeans in a grain elevator, the grain elevator can't sell it as seed both under the federal and state seed laws and under the Patent Variety Protection Act. That's why the solution for farmers like Mr. Bowman is to simply buy conventional seed, multiply it, you know, 20, 30, 40, 50, 80 times in a single generation, and save an 80th of it to replant in his second crop if he doesn't want to buy Roundup Ready technology for his second crop and use the glyphosate aerially. Unless the Court has further questions, we'll submit. Thank you, Mr. Waxman. Mr. Walters, you have five minutes remaining. I'd like to first address the statement that this is not a traditional farming practice. It may be occasional when a farmer is in a real desperate situation or it may apply to Mr. Bowman's situation where he wanted a very cheap source of seed for his second crop, but in the record at 153A, among other places, he discusses how he's gone to the grain elevator over the years a number of times and how other farmers have gone to the grain elevator for generations. So a ruling in favor of Monsanto here would effectively eliminate that seed... Do you agree that it's unlawful for grain elevators to sell it for replanting? No, I do not. And what he's referring to is state labeling laws that prevent grain elevators from actually scooping up grain, packaging it up, and saying this is seed because they all look alike to the eye, and so grain elevators are certainly not allowed to dupe seed purchasers, but those laws are there to protect the seed purchasers. Mr. Bowman bought grain without any restrictions on how he could use it. That broke no laws, and it does not violate the PVPA. I mean, Monsanto didn't assert a PVPA certificate. Surely it has them. It did not assert them in this case and could not assert them in this case because there's no single variety that Mr. Bowman planted. So that's not a good argument. What about Mr. Waxman's suggestion that we've already decided this in Microsoft versus AT&T? That case is not on point, Your Honor. That had to do with 271F and actually came out on the side of more restrictive patent rights, and this is not like software. This is an invention that the only way to use the invention... Now, I repeat, the only way to use the invention is to plant it and to grow more seeds. So if you don't apply the exhaustion doctrine and allow someone to use it, you're choosing patent rights over personal property rights, and that's never been done in 150 years of this Court's exhaustion case. Isn't no people or animals eat them? That's certainly a use... Well, then why is it the only way you could do is to plant them? That isn't the only thing you could do. You could go buy them in the grain elevator and sell them for other things. It's not use of the invention, Justice Breyer, and exhaustion is about conferring on the purchaser a right to use the invention. There's no limit... The invented product, the invented thing, the invented... The inventive aspect of the seed is it has a gene in it that repels some other insecticide or something that they have. I understand that. The same argument came up in Quanta, Your Honor, with the... You don't use that. I don't think they use that particular... Well, go ahead. Well, there were other uses for the computer chips, of course, that were asserted, and the key was that those computer chips practiced the patent, and you would swallow up the exhaustion doctrine entirely if we just could think of other uses for these things that have been sold. The key is, does it use the... Is the purchaser allowed to use the invention? And under Monsanto's theory, the purchaser isn't allowed to do that, and that's no exhaustion doctrine at all. I'm sorry. ...are mostly people who take these chips, whatever they are, the seeds, and they sell them for making tofu. They sell them to eat or... There are loads of uses, aren't there? But the only use of the invention is to plant it, and that's the use that Mr. Bowman made. Yeah, but that... Nothing prevents him from planting it. What he's prevented from doing is using the consequences of that planting, the second-generation seeds, for another planting. That's all he's prevented from doing. He can plant and harvest and eat or sell. He just can't plant, harvest, and then replant. So the judgment in this case was based on acres planted, and so I'm not sure how many... We talked a bit about the N plus 2 generation, and we don't know in the record what the N plus 2 generation was in terms of his sales or his yields. That wasn't before the district court on summary judgment. So I'm not sure how you could affirm based on the judgment below, which was a finding that conditional sales prevented the application of the exhaustion doctrine. The other thing... I'm sorry. I didn't follow that answer to Justice Scalia's question. Could you ask it again? You're saying that you're preventing him from using it. He's not prevented from using it. He can use it for what it's meant for, for raising a crop. He just cannot use that new crop for replanting. That's all. He has to sell that new crop for feed or for some other purpose. But to say that he's prevented from using what he's bought is simply not true. He can use it, plant it, and harvest the crop. But you're saying that there's no exhaustion in the progeny where he owns that seed outright. With that, we'll submit, and we'll ask that the Court of Appeals be reversed. Thank you. Thank you, counsel. The case is submitted.